**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CHRISTOFFERSON ROBB & COMPANY, LLC and GENERAL INVESTMENTS (CAYMAN), LIMITED,

                    *Plaintiffs*,

          v.

KANDEO INVESTMENT ADVISORS LLC, KANDEO SPAIN LATAM S.L.U., KANDEO SPAIN PERU S.L., I MEDICI SAS, and SANTIAGO BOTERO,

                    *Defendants*.

**Case No:** 26-cv-5806

COMPLAINT

JURY TRIAL DEMANDED

---

Plaintiffs Christofferson Robb & Company LLC ("CRC") and General Investments (Cayman), Limited ("GIC" and together with CRC, the "Plaintiffs"), as successor-in-interest to CRC Single Investor Fund VII Ltd, CRC Single Investor Fund XV Ltd., CRC Liquid Strategies Fund LP, CRC Single Investor Fund XIX LLC, CRC CRF IV, Ltd., Utah State Retirement Systems, CRC CRF V Europe SCSP-RAIF and Kasad 3 L.P. (collectively, the "CRC Funds"), allege, upon information and belief, except for their own conduct, matters of public record and disclosures made by Defendants (defined below) and their privies, as follows:

**OVERVIEW OF THE CASE**

1. This action arises from Defendants' multi-year scheme to fraudulently induce Plaintiffs to (i) purchase a non-bank loan originator and servicer company, FinSocial S.A.S. ("FinSocial" or the "Company"),[1] that was, in reality, a house of cards, supported by inflated and false financials, and (ii) then loan millions of dollars to FinSocial, the proceeds of which were used to cover-up the fraud and ultimately to enrich Defendants as the proceeds were wrongfully diverted

---

[1] FinSocial is a technology-enabled lender and servicer of payroll and pension-deduction loans.

out of FinSocial for their own benefit. In the end, Plaintiffs were left with a failing and depleted business, substantial liabilities, and a loss of their investments, exceeding $100 million in damages, as detailed below.

2.    CRC is a privately owned fund manager incorporated in Delaware with its place of business in New York. In or around July 2020, CRC was approached by Kandeo as part of an aggressive sale process devised by the Defendants to target U.S. entities about a potential investment in FinSocial, whose loan origination business was said to provide digital payroll deduction loans and consumer loans (the "FinSocial Loans") to public sector pensioners and teachers, as well as to low-income households, among others. As detailed further below, Defendants provided the Plaintiffs with "cooked books," including falsified financial statements, manipulated accounting records, and fabricated asset information that materially overstated FinSocial's financial performance and concealed the true nature of the business and its financial condition, while they misrepresented that those disclosures were complete and accurate.

3.    Following negotiations, on March 2, 2021, CRC entered into a Stock Purchase Agreement (the "SPA") with FinSocial equity holders Kandeo Spain Peru S.L. ("Kandeo Spain"), Kandeo Spain LATAM S.L.U ("Kandeo LATAM") and I Medici S.A.S. ("Medici" and together with Kandeo Spain and Kandeo LATAM, the "Sellers") through which CRC agreed to acquire 100% of FinSocial's equity. Kandeo Investment Advisors, LLC ("Kandeo Advisors US", and together with Kandeo Spain and Kandeo LATAM, "Kandeo") served as the U.S.-based investment advisory arm for Kandeo Spain and Kandeo LATAM in connection with the transactions at issue and was a signatory to certain provisions of the SPA. At all relevant times, Santiago Botero ("Botero" and together with Medici and Kandeo, the "Defendants") owned and controlled Medici, and was the founder of FinSocial, serving as its CEO both before and after the SPA. The SPA

2

closed on July 13, 2021 (the "Closing"). Based on the materially false and misleading information and presentations provided by Defendants, Plaintiffs were induced to pay approximately $36 million[2] (the "SPA Purchase Price") for the Company that was, in material respects, a complete façade.

4.  Immediately after being fraudulently induced to execute the SPA, Plaintiffs were fraudulently induced to provide liquidity to FinSocial through a $19 million loan (the "Bridge Loan"), which was independently negotiated and induced through additional misrepresentations including, among other things, fabricated or otherwise grossly overstated financials and asset valuations that included non-existent or uncollectable FinSocial Loans, and false certifications attesting to the accuracy of such financial information and the validity of the FinSocial Loans that served as collateral for the Bridge Loan.[3] Following the Closing, Plaintiffs and FinSocial entered into additional financing transactions (collectively and including the Bridge Loan, the "CRC Loans"), certain of which incorporated the Bridge Loan.[4]

5.  While Botero was at the center of Defendants' fraud, Kandeo knowingly participated in and benefited from his misconduct. Through the SPA and subsequent Bridge Loan, Kandeo was able to unload the failing Company for millions of dollars, and the proceeds of the Bridge Loan allowed Defendants to cover up the fact that FinSocial was a failing and sham business. After inducing Plaintiffs to advance the Bridge Loan to FinSocial, Botero, who remained in control as CEO after the SPA and Closing, looted FinSocial by fraudulently diverting tens of millions of dollars out of FinSocial to himself and his network of several dozen related entities, including family members and insiders (collectively, the "Botero Network"). Between January 1,

---

[2] Approximately $30 million was paid at Closing, with the balance deferred, as discussed below.

[3] Fund IV, Fund XV, and Strategies Fund were the lenders under the Bridge Loan.

[4] CRC is continuing to investigate issues relating to the issuance and disposition of the CRC Loans, and expressly reserves all rights regarding such.

2021 and August 31, 2024 alone, at Botero's direction, FinSocial disbursed tens of millions of dollars through transfers lacking any legitimate business purpose, including more than $50 million directly to Botero and his affiliates and millions more on credit cards to fund Botero's personal charges for luxury goods, high-end restaurants and lavish travel.

6.      As a result of Defendants' fraud, Plaintiffs were (i) left with a failing and depleted Company with substantial liabilities and uncollectible collateral; (ii) forced to repay third-party debt incurred under Defendants' direction; and (iii) required to inject additional capital to stabilize the business and attempt to recover their investment. In the end, however, such efforts were futile, and Plaintiffs suffered losses of their investment in FinSocial exceeding $100 million.

7.      By this Complaint, Plaintiffs seek to hold Defendants accountable for their fraud. *First*, Plaintiffs assert claims against Defendants for fraud related to the SPA transaction including (i) securities fraud under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; (ii) control liability under Section 20(a) of the Exchange Act; (iii) fraudulent inducement under New York law; and (iv) unjust enrichment under New York law.

8.      *Second*, Plaintiffs assert claims against Defendants for fraud related to the Bridge Loan made by Plaintiffs to FinSocial. Such claims include (i) fraudulent inducement under New York law; (ii) conspiracy to defraud under New York law; and (iii) unjust enrichment under New York law.

9.      *Third*, Plaintiffs assert claims against Botero related to his fraudulent looting of the Company. Such claims include (i) aiding and abetting fraud under New York law; (ii) alter ego liability under New York law; and (iii) unjust enrichment under New York law.

10.     As detailed below, damages against Defendants in connection with the foregoing include: (i) with respect to the SPA, $36 million jointly and severally; (ii) with respect to the Bridge

Loan, $19 million jointly and severally; and (iii) with respect to the fraudulent looting and diversion of funds from FinSocial, not less than $50 million against Botero; plus interest and fees as detailed more fully below.

**PARTIES AND RELATED NON-PARTIES**

**A.    Plaintiffs**

11.    Plaintiff CRC is a Delaware corporation with its principal place of business in New York. CRC is an investment manager that managed the CRC Funds that made the investments through which the transactions at issue were structured, negotiated, and funded. Pursuant to management agreements with the CRC Funds, CRC is authorized to act on behalf of the CRC Funds with respect to those investments and related claims, including in connection with the prosecution of this action.

12.    Plaintiff GIC is an exempted company organized under the laws of the Cayman Islands with its place of business in Grand Cayman. GIC is the successor-in-interest to the CRC Funds with respect to their investments in FinSocial.[5] Specifically, as successor-in-interest, GIC owns and controls the investment interests associated with the transactions at issue and has standing to assert all claims formerly held by the CRC Funds arising from the transactions described herein.

**B.    Non-Party CRC Funds**

13.    Non-Party CRC Single Investor Fund VII Ltd. is an exempted company incorporated under the laws of the Cayman Islands with its principal place of business in Grand Cayman ("Fund VII"). Fund VII is a CRC-managed investment fund that directly participated in

---

[5] Pursuant to a consolidation and restructuring agreement entered in or about September 2024, the CRC Funds' interests in FinSocial were assigned to GIC.

funding the SPA Purchase Price and/or the CRC Loans and holds interests in the FinSocial Trusts (defined below).

14.    Non-Party CRC Liquid Strategies Fund LP is a Delaware limited liability company with its principal place of business in Delaware ("Strategies Fund"). Strategies Fund is a CRC-managed investment fund that directly participated in funding the SPA Purchase Price and/or the CRC Loans and holds interests in the FinSocial Trusts.

15.    Non-Party CRC Single Investor Fund XV Ltd. is an exempted company incorporated under the laws of the Cayman Islands with its principal place of business in Grand Cayman ("Fund XV"). Fund XV is a CRC-managed investment fund that directly participated in funding the SPA Purchase Price and/or the CRC Loans and holds interests in the FinSocial Trusts.

16.    Non-Party CRC Single Investor Fund XIX LLC is a Delaware limited liability company with its principal place of business in Delaware ("Fund XIX"). Fund XIX is a CRC-managed investment fund that directly participated in funding the SPA Purchase Price and/or the CRC Loans and holds interests in the FinSocial Trusts.

17.    Non-Party CRC CRF IV, Ltd. is an exempted company incorporated under the laws of the Cayman Islands with its principal place of business in Grand Cayman ("Fund IV"). Fund IV is a CRC-managed investment fund that directly participated in funding the SPA Purchase Price and the CRC Loans and holds interests in the FinSocial Trusts.

18.    Non-Party CRC CRF V, Europe SCSP-RAIF ("Fund V") is a limited partnership incorporated under the laws of Luxembourg with its principal place of business in Luxembourg. Fund V is a CRC-managed investment fund that directly participated in funding the SPA Purchase Price and the CRC Loans and holds interests in the FinSocial Trusts.

19.    Non-Party Utah State Retirement Systems ("USRS") is a public pension fund organized under the laws of the State of Utah with its principal place of business in Salt Lake City, Utah. USRS is an ERISA-covered plan with investments in FinSocial which are managed by CRC. USRS directly participated in funding the SPA Purchase Price and the CRC Loans and holds interests in the FinSocial Trusts.

20.    Non-Party Kasad 3 L.P. ("Kasad") is an exempted limited partnership incorporated under the laws of the Cayman Islands with its principal place of business in Grand Cayman. Kasad is a CRC-managed entity that directly participated in funding the SPA Purchase Price and/or the CRC Loans and holds interests in the FinSocial Trusts.

C.    **Defendants**

21.    Defendant Kandeo Advisors U.S. is a Delaware corporation with its principal place of business in Miami, Florida. Kandeo Advisors U.S. advised Kandeo Spain and Kandeo LATAM in connection with soliciting and negotiating the SPA, the Bridge Loan, and other CRC Loans with CRC in New York, and directed communications and financial flows to and through New York. Kandeo Advisors U.S. is affiliated with, under common ownership and control with, and acted as agent for, Defendants Kandeo Spain and Kandeo LATAM in connection with the transactions at issue.

22.    Defendant Kandeo LATAM is a private equity fund management entity organized under the laws of Spain, with its registered office in Spain and operational offices in the United States (including Miami, Florida), Colombia, Mexico, and Peru. At all relevant times leading up to the transactions at issue herein through the Closing, Kandeo LATAM was a co-owner of FinSocial's equity (and together with Kandeo Spain, held approximately 70% of the subscribed

and outstanding shares[6]) and a Seller under the SPA. Kandeo LATAM transacted business in New York, including by, among other things: (i) negotiating the SPA, the Bridge Loan, and other CRC Loans with CRC in New York; (ii) soliciting CRC's New York-based investment platform as the buyer and lender for FinSocial; (iii) directing communications and documents to and through New York; (iv) transmitting and/or causing to be transmitted materially false financial information and representations to CRC in New York; (v) receiving the SPA Purchase Price through U.S. correspondent bank accounts at Bank of New York Mellon ("BNY") in New York; and (vi) directing funding of the CRC Loans through Citibank in New York.

23.     Defendant Kandeo Spain is a private equity fund management entity organized under the laws of Spain, with its registered office in Spain and operational offices in the United States (including Miami, Florida), Colombia, Mexico, and Peru. At all relevant times leading up to the transactions at issue herein through the Closing, Kandeo Spain was a co-owner of FinSocial's equity (and together with Kandeo LATAM, held approximately 70% of the subscribed and outstanding shares) and a Seller under the SPA. Kandeo Spain transacted business in New York together with Kandeo LATAM by, among other things: (i) negotiating the SPA, the Bridge Loan, and other CRC Loans with CRC in New York; (ii) leading the SPA negotiations with CRC's New York team; (iii) proposing the initial SPA draft; (iv) transmitting and/or causing to be transmitted materially false financial information and representations to CRC in New York; (v) receiving the SPA Purchase Price through U.S. correspondent bank accounts at BNY; (vi) directing funding of the CRC Loans through Citibank in New York; and (vii) acting as the primary Seller-side counterparty with CRC's New York deal team.

---

[6] Kandeo held 50% of the voting rights.

24.     Defendant Medici is a Colombian entity founded, owned, and controlled by Botero.[7] Medici was Botero's primary holding vehicle for FinSocial's equity and a Seller under the SPA. Medici (individually and through Botero) transacted business in New York by, among other things: (i) participating in the SPA negotiations with CRC's New York deal team; (ii) directing financial flows through New York; (iii) transmitting and/or causing to be transmitted materially false financial statements and certifications to CRC in New York; (iv) deriving substantial revenue from international commerce through New York; and (v) participating in financial transactions routed through New York-based U.S. financial institutions.[8] After selling its FinSocial equity in 2021 through the SPA, Medici continued to receive payments from FinSocial totaling at least $3,257,115 through August 2024 and a cash payment improperly diverted from FinSocial in March 2023 for in excess of $2.6 million, discussed below. Medici also functioned as a vehicle through which proceeds of the subject frauds were transferred and concealed, including a $1.65 million transfer through a Morgan Stanley account in New York.

25.     Defendant Botero is a Colombian national from one of Colombia's most prominent families, and a former Colombian presidential candidate. Botero founded FinSocial and served as its CEO from inception through his forced resignation in September 2024. In addition, Botero founded, owns, and controls Medici and is one of the lead architects of the fraudulent schemes described in this Complaint. He personally directed the fraud against Plaintiffs (in concert with Kandeo) including, among other things, falsifying FinSocial's financial statements and records, reporting fictitious loan collateral and assets, transmitting false certifications to CRC in New

---

[7] While controlled by Botero, Medici's other shareholders include Botero's parents, his stepmother and her partner, and a former FinSocial C-level executive.

[8] Personal jurisdiction over Medici is also supported by Botero's acts described further below and his control and domination of Medici.

York,[9] and diverting the proceeds of the CRC Loans to himself and the Botero Network. Botero transacted business in New York by, among other things: (i) attending meetings and other events with CRC's New York deal team at CRC's Manhattan offices; (ii) participating in Zoom sessions with CRC's New York deal team; (iii) conducting and/or participating in FinSocial board meetings coordinated through CRC's New York office; (iv) directing the funding of the CRC Loans and the fraudulent transfer of loan proceeds through New York;[10] (v) directing a $1.65 million transfer from Medici to his related entity, SB Financial Holdings Corp., through a Morgan Stanley account in New York; and (vi) establishing U.S. entities as part of the Botero Network to directly and/or indirectly receive tens of millions of dollars in diverted proceeds from FinSocial. Botero also has strong ties to the United States including business interests, corporate affiliations, visa status, and high-value assets including a significant art collection and real property holdings.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

27.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts as the federal claim. The state law claims involve substantially the same parties, transactions, communications, witnesses, and evidence as the federal claims, and judicial economy, convenience, and fairness strongly favor resolution of all claims in a single proceeding.

---

[9] Defendants transmitted false certifications and materially false financial information in New York.

[10] After the Closing, Botero used Medici's SPA proceeds to purchase a family residence in Miami, Florida.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a). A substantial part of the events giving rise to these claims occurred in this District, including that (a) the SPA transaction was negotiated through CRC's New York office and its New York-based deal team and executed from New York; (b) key documents related to the SPA, Bridge Loan, and other CRC Loans were transmitted to and are located in New York; (c) the sale proceeds under the SPA were transmitted to Kandeo in U.S. dollars through its U.S. correspondent bank, BNY in New York; (d) the proceeds of the Bridge Loan and other CRC Loans were denominated in US dollars under the underlying loan agreements and funded through Citibank correspondent accounts in New York; (e) Botero attended meetings and a holiday party in CRC's New York office and regularly communicated with CRC in New York where its office is located and where its relevant deal team was based; (f) Defendants transmitted false financial certifications and fraudulent financial reports to CRC in New York; (g) investors committed and funded capital managed through CRC's New York platform; and (h) CRC suffered economic injury in New York.

29.     This Court has personal jurisdiction over each Defendant under New York's long arm statute, and personal jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Each Defendant has purposefully availed itself of the privilege of conducting activities within this State, such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. As more fully alleged herein, the claims asserted in this Complaint arise directly out of, and relate to, Defendants' contacts with this State, including, without limitation, the acts, transactions, and conduct described herein. The exercise of jurisdiction over each Defendant in this forum is reasonable and comports with due process in light of, among other factors, the burden on each Defendant, New York's interest in adjudicating the dispute, and Plaintiffs' interest in obtaining convenient and effective relief.

30.     In addition, Defendants' (i) use of U.S. dollar-denominated wire transfers through New York-based correspondent banking infrastructure at BNY and Citibank to receive the fruits of their fraudulent scheme; (ii) deliberate targeting of a New York-based investment manager; and (iii) sustained commercial relationships with CRC's New York office, collectively establish that the exercise of personal jurisdiction over each Defendant is consistent with due process. Defendants purposefully availed themselves of the privileges of conducting business in New York and in the United States, and the claims herein arise directly from their related New York contacts. Indeed, Defendants' deliberate use of New York-based correspondent banking infrastructure was integral to their fraudulent scheme. The majority of SPA sale proceeds were paid in U.S. dollars to Kandeo through U.S. correspondent bank accounts at BNY, with Kandeo receiving nearly $19 million in SWIFT transfers via BNY.[11] The CRC Loans, including an additional $19 million advanced through the Bridge Loan, were funded through a Citibank intermediary account in New York. Evidence further shows a $1.65 million transfer from Medici to Botero's Florida entity, SB Financial Holdings Corp., through an account at Morgan Stanley Bank in New York. Moreover, tens of millions of the fraudulently diverted CRC Loan proceeds were transferred to U.S.-based Botero Entities. These financial flows were not incidental; Defendants purposefully availed themselves of New York's banking infrastructure and capital markets to execute, fund, and profit from their fraudulent schemes.[12]

## STATEMENT OF FACTS

31.     As detailed herein, and concealed from Plaintiffs at the time of the SPA, FinSocial was a house of cards, established by Botero and propped up by bogus assets and "cooked" books,

---

[11] Kandeo Spain was paid $11,766,993.47 US and Kandeo Latam was paid $7,070,374.06 US through BNY.

[12] In addition, CRC was assisted on the transaction by Ernst &Young ("E&Y") who was subsequently engaged as CRC's financial advisor. Such engagement was governed by U.S. Law (Delaware) and E&Y's principal contacts at CRC related to the engagement were located in New York.

among other things. CRC was targeted by Defendants as a funding source and was fraudulently induced into investing funds in FinSocial that were ultimately diverted and used for Defendants' own personal gain and/or to cover up their fraudulent schemes.

**A.    Botero and Kandeo Induce Plaintiff into a Fraudulent Sale Through Material Misrepresentations**

32.    CRC is a privately owned fund manager with its principal place of business in New York. In or around July 2020, Kandeo approached CRC and claimed to be seeking U.S. based investors and/or managed funds to access a broader and deeper pool of capital than was available in Colombia, but with the real intention of offloading and profiting from their interests in the failing and fraudulent FinSocial.

33.    Prior to the Closing, Kandeo owned approximately 70% of the stock of FinSocial and held two board seats, and selected and/or approved two other independent directors out of a total of six board seats.[13] As described to CRC, Finsocial was a consumer finance company that purported to provide digital payroll deduction and unsecured installment loans (*i.e.*, the FinSocial Loans) primarily to pensioners and public-sector teachers, as well as low-income households. FinSocial developed a fully digital product where prospective borrowers would apply for loans online, and upon underwriting approvals (and execution of loan documentation), the FinSocial Loans were funded. Under the alleged system in place, payroll deduction loans were repaid through automatic deductions from the borrower's salary or pension, while installment loans were repaid directly by the borrower. Each FinSocial Loan was purportedly supported by multiple forms of credit protection, including life and unemployment insurance, a surety bond, and/or credit guaranty.

---

[13] Under the bylaws, Kandeo and Medici each selected one of the independent directors subject to the other's approval. Medici held the other two board seats.

34.     CRC negotiated with Defendants through its New York-based deal team. Kandeo led the negotiations for the Sellers and proposed the initial form of the SPA. Christian Lesmes, among others, a managing director at Kandeo (and member of the FinSocial board), co-led the negotiations on behalf of Kandeo. During the course of negotiations, Plaintiffs were provided access to a data room set up by Defendants in the latter part of 2022, through Intralinks, a global document sharing platform, and received emails from Defendants, many times weekly, notifying them when additional documents were uploaded. Documents provided by Defendants in the data room included FinSocial's financial statements and related books and records from 2017 onward, including financial statements for 2019, 2020, and 2021, which were false, as discussed below.[14]

35.     Following negotiations and related diligence, CRC executed the SPA in New York, on or about March 2, 2021. The primary parties to the SPA were CRC, Medici, and Kandeo. The SPA became a binding agreement upon the parties exchange of executed signature pages with CRC in New York. The transaction closed on July 13, 2021. Through the SPA, CRC acquired 100% of FinSocial's issued and outstanding equity for the SPA Purchase Price of approximately $36 million.[15] Kandeo directed and received the majority of such funds through New York. A true and correct copy of the SPA is attached hereto as **Exhibit A.**

36.     In connection with the sale, CRC designated Aviario Co. S.A.S. ("Aviario"), a Colombian corporation sponsored by CRC, as the acquisition vehicle to hold ownership of FinSocial's equity pursuant to the SPA. At Closing, the FinSocial shares were acquired through Aviario, and the SPA Purchase Price was funded by the CRC Funds.[16] Monies invested to fund the

---

[14] Bancolombia, a full-service financial institution, served as Sellers' investment bankers in connection with the sale transaction. Bancolombia trades on the NYSE through a holding company structure.

[15] Including deferred consideration.

[16] On December 31, 2021, Aviario was merged by absorption with FinSocial.

acquisition and subsequent CRC Loans (including the Bridge Loan) were provided in part by U.S. based investors, including pension funds. In addition, prior to the acquisition, one of FinSocial's main debt facilities was with Morgan Stanley and governed by New York law. The Morgan Stanley facility was repaid by CRC at or around the Closing.

37.     In order to induce Plaintiffs to enter into the SPA and pay the SPA Purchase Price, Defendants made a series of representations and warranties that were memorialized in the SPA signed by Defendants, which were fraudulent, and materially false and misleading. In particular, Defendants made the following material misrepresentations about Finsocial (collectively referred to as the "SPA Misrepresentations"):

38.     *First*, Defendants represented in the SPA that FinSocial's financial statements including for the most recent years 2019 through the stub year 2021 "(a) were prepared in accordance with the Applicable Accounting Principles and Applicable Law; (b) are true, complete and correct in all material respects; (c) are based on the books and records of the Company, and (d) fairly present the financial position, results of operations and cash flows of the Company in all respects, as of the dates and for the periods indicated therein." *See* SPA § 5.3. As detailed further below, that representation was materially false and misleading.

39.     *Second*, Defendants represented in the SPA that FinSocial's "accounting books, registers, minutes books, bank accounts and other corporate records of the Company are true, correct and complete in all material respects, in accordance with applicable Law." *Id*. § 5.4. As detailed further below, that representation was materially false and misleading.

40.     *Third*, Defendants represented in the SPA that "each [FinSocial] Loan, revolving credit facility, letter of credit or other extension of credit or commitment to extend credit (collectively, "Extensions of Credit") made or granted by the Company is evidenced by promissory

notes, mortgages or other evidences of Indebtedness, which, together with all security agreements and guarantees, are valid and legally binding obligations of the Company." *Id*. § 5.11. As detailed further below, that representation was materially false and misleading.

41.    *Fourth*, Defendants represented in the SPA that FinSocial had sufficient assets. *Id*. § 5.13. As detailed further below, that representation was materially false and misleading.

42.    *Fifth*, Defendants represented in the SPA that "[t]he Company has previously delivered to Buyer a loan data tape in Excel format disclosing information regarding all loans, notes, borrowing arrangements and other commitments for credit relationships by the Company as of the date previously delivered, which information is accurate and complete in all respects as of the date hereof (except for minor or clerical inaccuracies). *Id*. § 5.11. As detailed below, that representation was materially false and misleading.

43.    *Sixth*, Defendants represented in the SPA that "[n]one of the Payroll Deductible Loans or Consumer Loans have been transferred to more than one third-party buyer or given as collateral or guarantee to any third-party Buyer or creditor of the Company or any of the Trusts, in violation of any of the Material Agreements." *Id*. § 5.11. As detailed further below, that representation was materially false and misleading.

44.    *Seventh*, Defendants represented in the SPA that "the business of the Company has been conducted in the ordinary course consistent with past practice and there has not been: (i) any event, development or state of circumstances that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect." "Material Adverse Effect," included, among other things any material change to the business, liabilities, or assets. *Id*. § 5.5. As detailed further below, that representation was materially false and misleading.

45.    CRC reasonably relied on the SPA Misrepresentations in entering into the SPA and paying the SPA Purchase Price.

**B.    FinSocial, Under the Control of Botero and Kandeo, Falsifies Its Financial and Accounting Information to Defraud CRC**

46.    This section provides a summary of Defendants' financial and accounting misrepresentations and related malfeasance used to fraudulently induce CRC to enter the SPA to purchase FinSocial's equity and later to make the Bridge Loan to finance and perpetuate FinSocial's fraudulent business and benefit Defendants, as discussed below.

47.    Specifically, during the period from before 2019 through 2021 leading up to the SPA, FinSocial (controlled by Kandeo and Botero) engaged in an egregious pattern of financial and accounting fraud including, among other things, intentionally overstating assets, inflating revenues, understating liabilities, concealing transactions with related third parties, and pledging delinquent or non-existent collateral.[17]

48.    These fraudulent misrepresentations, detailed below (collectively, the "Financial and Collateral Misrepresentations"), were made in, among other things, financial reports (including for fiscal years 2019, 2020, and 2021) prepared by FinSocial management under the direction of Botero and Kandeo, and/or with their knowledge and consent, and certified by KPMG without qualification, and provided to CRC as part of the due diligence process with respect to the SPA and Bridge Loan.[18] A true and correct copy of the FinSocial financial statement for 2019 provided to Plaintiffs is attached hereto as **Exhibit B**. A true and correct copy of the FinSocial financial statement for 2020 provided to Plaintiffs is attached hereto as **Exhibit C**. A true and

---

[17] Such conduct pre-dated the SPA, but was deliberately concealed from Plaintiffs through the Financial and Collateral Misrepresentations (defined below), among other things.

[18] The financial report for 2021 covered the stub year at that time and was later supplemented to cover the full year.

correct copy of the FinSocial financial statement for 2021 provided to Plaintiffs is attached hereto as **Exhibit D**.[19]

49.    FinSocial's financial statements were ultimately restated in 2024, revealing overstated assets and understated liabilities by a combined $95 million and losses of nearly $75 million as detailed below. The Financial and Collateral Misrepresentations include the following.

1.    **Defendants' Use "Fake" FinSocial Loans to Grossly Misstate Their Assets and Financial Viability**

50.    Defendants grossly misstated FinSocial's assets through the use of "fake loans" in at least three different ways: (i) reporting non-existent FinSocial Loans as collateral (including to lender Bancolodex as discussed below); (ii) pledging certain FinSocial Loans made to FinSocial employees and third parties that had already been settled and canceled through payroll deductions taken directly by FinSocial; and (iii) pledging FinSocial Loans made to the Botero Network that were never intended to be repaid.[20]

51.    For example, Bancolodex, a Colombian government-owned development bank, provided revolving credit facilities to FinSocial to fund the origination of new FinSocial Loans. Contrary to FinSocial's financial statements indicating that the facilities were over-collateralized by 15–20% in 2019 and 2020, an audit conducted in February 2025 by Bancolodex concluded that the entirety of the portfolio pledged to its debt must be replaced, with approximately 98% of loans 30+ days delinquent and approximately 84% of the outstanding principal (approximately COP 42

---

[19] Spanish-language exhibits annexed to the complaint are accompanied with an English translation provided solely for the convenience of the Court and the parties, and is not a certified translation. Plaintiffs reserve the right to submit certified translations, if necessary, during these proceedings.

[20] In addition, despite that FinSocial's business model was to provide relatively modest (typically less than $10,000) loans to pensioners, teachers, and lower income households, FinSocial issued scores of loans to Botero's friends and affiliates, often for sums in excess of $100,000, which were designed to curry favor, and keep the fraudulent scheme going undetected.

billion ($12 million) as of January 2025) never collected.[21] A true and correct copy of the Bancolodex audit is attached as **Exhibit E.** That audit concluded that FinSocial Loans pledged by FinSocial as collateral were fictitious, despite that monthly certifications had been issued by FinSocial, certifying that the portfolio had been properly originated and contained no delinquent loans. The foregoing evidences a staggering misrepresentation of asset quality and value in the FinSocial financial statements that were communicated to Plaintiffs in connection with the SPA (and later the Bridge Loan). As a result of such fraud, CRC ultimately had to repay the Bancolodex facilities.

52.    These fraudulent reporting and accounting practices rendered the SPA Misrepresentations and Loan Misrepresentations materially false and misleading.

### 2. Defendants Grossly Inflate FinSocial's Assets by Hiding FinSocial Loan Delinquencies

53.    Defendants artificially "normalized" FinSocial Loans through the fraudulent use of so-called "security rings." As background to this practice, FinSocial maintained a surety reserve fund, which was used as a form of insurance for delinquent FinSocial Loans. Under this practice, when a delinquent loan installment was covered by a payment from the surety reserve fund, the delinquent loan was reclassified as "current" and marked as performing in reports shared with third parties – even though the loan was covered by a payment from the reserve fund rather than a payment from the borrower. In other words, by misclassifying delinquent FinSocial Loans as in good standing, the reserve fund was being used by Defendants to cover-up delinquency on older loans.

---

[21] More alarmingly, those "uncollectable" loans were flagged internally as "not disbursed," indicating that they were never formally originated and/or never met the eligibility criteria.

54.    Between 2019-2021, Defendants overstated such assets by approximately COP 51 billion (app. $15 million). Those fraudulently inflated values were represented to Plaintiffs in connection with the SPA and Bridge Loan creating a perception of asset quality and portfolio performance that was materially false and misleading. Plaintiffs relied on those misrepresentations in entering into the SPA and Bridge Loan.

55.    Defendants also materially misstated the delinquency rate of the Finsocial Loan portfolio that Finsocial used to support the SPA and pledged as collateral as part of the Bridge Loan and other lending. By booking non-performing FinSocial Loans as viable assets, Defendants materially inflated FinSocial's assets. For example, with respect to the approximately COP 230 billion ($66 million) loan portfolio initially pledged by FinSocial to CRC as collateral in connection with the CRC Loans, including the Bridge Loan, approximately COP 64 billion ($18 million) (28% of the total) was already classified as delinquent as of year-end 2021, less than one year after origination. This level of early-stage deterioration is highly atypical and inconsistent with the risk profile that was represented during the investment process and with the asset class, which is normally one of the lowest delinquency consumer credit segments. Typical default rates in contrast should have ranged from 1%-2% depending upon the facility.

56.    These fraudulent reporting and accounting practices rendered the SPA Misrepresentations and Loan Misrepresentations materially false and misleading.

   **3.    Defendants Grossly Overstate FinSocial's Revenue by Recording Insurance Premiums as Income**

57.    When FinSocial originated FinSocial Loans (typically to working-class employees through various unions and associations of which they were members), to protect the loan from a default, FinSocial collected life and credit insurance premiums upfront from borrowers by

deducting these sums from loan amounts disbursed to each borrower.[22] For life insurance, the total premium corresponding to the full loan term was deducted from the loan proceeds at disbursement, capped at 120 months. For credit insurance, the premium collected at origination covered a five-year term. Such collections should have been recorded as funds held on behalf of third parties, not as FinSocial revenue, because until the funds are remitted to the corresponding insurers, they are liabilities and should be reflected as liabilities (accounts payable) on the balance sheet. In practice, however, FinSocial did not record the corresponding payables, but recognized the insurance collections as revenue in its income statement, artificially inflating reported earnings and understating liabilities.

58.    In the case of life insurance, although the full-term premium was deducted upfront from the borrower's disbursement, FinSocial management at the time opted to contract coverage on a month-to-month basis rather than securing policies for the full loan term. This meant that FinSocial, in a manner inconsistent with accounting standards and contrary to fiduciary principles, effectively used borrowers' prepaid insurance premiums to inflate revenue when they should have been treated as liabilities. Further, once loan origination stopped and no new upfront premiums were collected, the monthly reinsurance payments became a recurring cash expense for FinSocial.

59.    During the period from 2019 to 2021, these Financial and Collateral Misrepresentations stemming from the recognition of unsupported income entries and the deliberate misclassification of third-party collections, as listed in FinSocial's financial statements for such period, inflated FinSocial's reported revenues by approximately COP 65.4 billion (app. $19 million). These inflated figures were uncovered as part of the restatement of FinSocial's

---

[22] Insurance was designed to protect FinSocial from a default in repayment of a loan in the event of credit issues and/or death of the borrower.

financials as discussed below and stemmed from the recognition of unsupported income entries and the deliberate misclassification of third-party collections.

60.     The foregoing resulted in FinSocial materially overstating its income and understating its liabilities, misleading CRC regarding FinSocial's true financial condition.

61.      These fraudulent reporting and accounting practices rendered the SPA Misrepresentations and Loan Misrepresentations materially false and misleading.

### 4.     Defendants Fail to Record Extensive Liabilities for Underperforming FinSocial Loans

62.     In addition to secured credit lines such as those provided by CRC, FinSocial regularly financed its new loan origination by selling loan portfolios to third-party buyers with recourse. Under these arrangements, the recourse structure meant that if any eligibility criteria were breached, such as the expiration of required life or credit insurance policies, or more commonly, if loans exceeded specific delinquency thresholds, FinSocial was obligated to either replace or repurchase the affected FinSocial Loans. In certain agreements, FinSocial also bore full repayment responsibility, meaning it was required to cover all unpaid installments on behalf of defaulting borrowers.

63.     From an accounting perspective, these contractual obligations should have been recognized as accounts payable, particularly when there was clear evidence that the underlying FinSocial Loans had entered a delinquency status and had not yet been repurchased or replaced. From 2019 through 2021, Finsocial materially understated liabilities owed to portfolio buyers in its financial statements. The portion of FinSocial Loans held by third-party purchasers that were more than 90 days past due and subject to repurchase by FinSocial (*i.e.*, a liability) exceeded COP 23 billion ($6.5 million). After accounting for amounts covered under "installments responsibility" clauses (*i.e.*, where FinSocial had already assumed installments, rather than repurchasing the

22

loans), a substantial portion of this exposure should have been provisioned as a liability on the Company's balance sheet. Moreover, these estimated figures constitute a lower bound of what should have been recorded as liabilities, given that all the expected delinquency over the life of the loans sold had recourse against FinSocial.

64. The failure to record extensive liabilities for underperforming FinSocial Loans similarly misled CRC regarding FinSocial's true financial condition.

65. These fraudulent reporting and accounting practices rendered the SPA Misrepresentations and Loan Misrepresentations materially false and misleading.

**5.      Defendants Fail to Disclose Transactions with Parties Related to Botero**

66. Between 2019 and 2021, FinSocial executed transactions totaling approximately COP 57 billion (approximately $16 million) with companies either fully or partially owned by its CEO and controlling shareholder, Botero. These transactions were not disclosed in the financial statements provided to Plaintiffs, which define related parties in terms of control, significant influence, and close personal or professional relationships.

67. While FinSocial's 2021 financial statements FinSocial include a brief reference to related-party matters (Note 28), the disclosure was limited to a loan granted to the Company by funds and entities managed by CRC. No other related-party transactions were disclosed.

68. Moreover, FinSocial's financial statements for fiscal years 2019 and 2020 included no note whatsoever addressing related-party matters, nor any statement affirming the existence or absence of such transactions.

69. The omission of these third-party transactions contravenes generally accepted accounting principles and materially misrepresented FinSocial's financial position to Plaintiff. By not disclosing these relationships and transactions, Defendants deliberately misled CRC, and obscured the actual operational and financial dynamics of FinSocial in furtherance of the

23

fraudulent schemes. In addition, failure to disclose such transactions obscured the risk of keeping Botero in place as CEO (with control of FinSocial's finances) after the acquisition.

70.    In sum, the Defendants used several fraudulent mechanisms to overstate FinSocial's assets including (i) the use of fake, ineligible or non-performing loans as collateral; and (ii) the application of portfolio impairment methodologies that deviated from regulatory guidelines and international accounting standards designed to prevent fraud/malfeasance.

71.    These fraudulent reporting and accounting practices rendered the SPA Misrepresentations and Loan Misrepresentations materially false and misleading.

**C.    Defendants Make Further Fraudulent Misrepresentations to Induce CRC to Fund the Bridge Loan**

72.    Following entry into the SPA, in May 2021, CRC made the Bridge Loan to FinSocial in the amount of approximately $19 million (entered into after the execution of the SPA but before Closing). The Bridge Loan was made through the CRC Funds and was to be used by FinSocial for the sole purpose of originating the FinSocial Loans.

73.    To induce Plaintiffs to enter into the Bridge Loan, Defendants, acting through (and directing) FinSocial, made a series of representations and warranties in the Bridge Loan agreement (the "Bridge Loan Agreement") that were fraudulent, false, and misleading (collectively, referred to, as the "Loan Misrepresentations"). A true and correct copy of the Bridge Loan Agreement and corresponding notes is attached as **Exhibit F.**

74.    *First*, Defendants represented in the Bridge Loan Agreement that "the Debtor has disclosed or revealed to the Creditors all information or documentation relating to it, as well as any matter, event, fact, or circumstance that, individually or collectively, could give rise to a Material Adverse Effect [which, among other things, includes any material "change, effect, event, situation

or condition . . . on: (a) the business, operations, liabilities, or assets of the Debtor. . . . "]. *Id*. § 3.08. That representation was materially false and misleading.

75. *Second*, Defendants represented in the Bridge Loan Agreement that "[n]o report, financial statement, certificate, presentation, or other information provided by or on behalf of the Debtor to the Creditors in connection with this Agreement contains any material or relevant statements that are incorrect, nor do they omit to state any material or relevant facts necessary to prevent the statements contained therein, in light of the circumstances under which they were made, from being misleading. . . . ." *Id*. That representation was materially false and misleading.

76. *Third* Defendants represented in the Bridge Loan Agreement that the collateral supporting the loans "[has] not been previously transferred or promised as collateral or in ownership in favor of third parties." *Id*. § 3.12. That representation was materially false and misleading.

77. As is the case with the SPA Misrepresentations, the Defendants' Loan Misrepresentations were materially false and misleading. Defendants used "cooked" financial statements to fraudulently induce the Bridge Loan. Moreover, the purported collateral for the Bridge Loan was fake and/or in default, and the Bridge Loan was grossly under collateralized. This was due to the reasons described above, including, amongst other things, Defendants' misrepresentations of the state of FinSocial's assets, liabilities, and income, and the provision of fictitious and defaulted FinSocial Loans to secure the Bridge Loan. CRC relied on the Loan Misrepresentations in entering into the Bridge Loan Agreement and advancing the Bridge Loan.

78. In addition, on or about May 21, 2021, in connection with the Bridge Loan, Defendants transmitted and/or caused to be transmitted false certifications (collectively, the "False Certifications") to CRC in New York including certifications signed by FinSocial and a third-party

certification company attesting that FinSocial's representations in the Bridge Loan Agreement were true and correct. A true and correct copy of the False Certifications is attached as **Exhibit G.**

79.     Defendants falsely certified, amongst other things, that FinSocial was in compliance with the provisions of the Bridge Loan Agreement, including that "with respect to the Debtor, no circumstances, events, or actions have occurred that have produced or could reasonably be expected to produce a Material Adverse Effect," which included, among other things, any material change to the business, liabilities, or assets. The certification went on to falsely provide that "the Debtor has not breached its obligations under the Share Purchase Agreement, and to the best of its knowledge, the other parties to the Share Purchase Agreement have not breached their obligations under this agreement. As detailed above, that representation was materially false and misleading. Id, at G-1.

80.     A similar representation was provided on May 21, 2021, by FinSocial's third-party certification company, at the direction of the Defendants, confirming that in compliance with the Bridge Loan Agreement, "(i) all conditions precedent to Disbursement set forth in Section 4.01 [which includes delivery of certified, audited, and reviewed financial statements for 2020 and unaudited financials as of 3/21] of the Bridge Loan Agreement have been satisfied." Id., at G-2.

81.     Further, on the same date, FinSocial provided a False Certification executed by Botero, affirming that in consideration for the advance of the Bridge Loan, "the requested facility will be used exclusively as working capital for granting new consumer loans or payroll loans in accordance with its own credit policies. . ." *See* Certifications, Exhibit " ". Id., at G-3.

82.     These False Certifications were in addition to the Loan Misrepresentations made in the Bridge Loan Agreement itself. The False Certifications further attested to the fact that the Bridge Loan would be used for appropriate business purposes to fund the FinSocial Loans, as

required under the Bridge Loan Agreement, while the proceeds were instead diverted to Botero and the Botero Network, as described below.[23]

83.    As described herein, the Financial and Collateral Misrepresentations, Loan Misrepresentations, and False Certifications were false: the collateral pledged was fictitious or non-performing, and FinSocial's financial condition was materially misrepresented.

84.    CRC relied upon such material misrepresentations in entering into and advancing the Bridge Loan. In particular, Plaintiffs advanced proceeds to FinSocial in reliance upon the explicit agreement and understanding that the Bridge Loan was adequately collateralized and the FinSocial Loans originated with proceeds of the Bridge Loan would be available to satisfy the Bridge Loan. However, such representations by Defendants proved to be false and Plaintiffs were fraudulently induced to enter the Bridge Loan Agreement without proper recourse.

**D.    Defendants Continued Control of FinSocial**

85.    Botero and Kandeo remained in control of FinSocial throughout the course of the Bridge Loan and SPA transactions. At the same time, Kandeo aggressively pushed CRC to advance the Bridge Loan. In addition, based upon Defendants' fraudulent misrepresentations and omissions, Defendants induced CRC to keep Botero in control of FinSocial post-SPA to assist with the transition of the business. As a result, Botero remained FinSocial's CEO both during and after the SPA transaction, with authority over FinSocial's day-to-day business operations. Defendants thus concealed the fraudulent scheme and used the Bridge Loan to prop up FinSocial, thereby hiding the true nature of FinSocial's operations from CRC. Ultimately, FinSocial defaulted on

---

[23] Defendants also represented in the Bridge Loan Agreement that "[t]he Debtor undertakes to use the proceeds of the Disbursement exclusively as working capital for the granting of new consumer loans or payroll loans in accordance with its own credit policies." Bridge Loan Agreement, § 2.03. That representation was materially false and misleading.

repayment of the Bridge Loan (as well as the other CRC Loans), which remain due and payable as discussed further below.

86.     Soon after Botero resigned as CEO, his CFO, Juan Manuel Puerto ("Puerto"), admitted to CRC that FinSocial's financial books were "cooked" and that Botero had been lying about the status of the collateral provided by FinSocial to induce CRC to continue to advance funds against fake and non-performing FinSocial Loans.

**E.     Botero Uses His Vast Network to Siphon Funds Out of FinSocial for His Own Benefit and the Benefit of His Network of Insiders**

**1.     CRC Advanced Additional Loans, which were Diverted by Botero**

87.     After the Closing (with Botero continuing as CEO), CRC advanced additional CRC Loans beyond the Bridge Loan, which were also to be used by FinSocial for the sole purpose of originating the FinSocial Loans. Initially, the CRC Loans were advanced to FinSocial directly, but thereafter were converted to a securitization structure, wherein trust vehicles (collectively, the "FinSocial Trusts"), were used to hold related collateral and advance the CRC Loan proceeds.

88.     The CRC Funds and FinSocial (and/or the FinSocial Trusts on behalf of FinSocial), entered into loan agreements with respect to the CRC Loans including as follows:[24] (i) two initial loans, the Bridge Loan, and a closing loan dated July 2021 (negotiated prior to, but entered into shortly after the Closing) in the amount of approximately $61 million (the "Closing Loan") (the Bridge and Closing Loans were subsequently consolidated and restated into one loan agreement); and (ii) two additional loans in the amount of approximately $118 million and $44 million,

---

[24] The loan agreements provided, among other things, that as a condition precedent for the second disbursement under the CRC Loans, FinSocial must, within ninety (90) days after the first disbursement of a loan it originated, establish the FinSocial Trusts to hold the FinSocial Loans that were to be assigned to the FinSocial Trusts as collateral for the CRC Loans. Pursuant to the agreements establishing the FinSocial Trusts (the "Trust Agreements"), CRC Loans were made available to trust vehicles P.A. CRC, P.A. Finsocrece and P.A. Finsocrece. FinSocial

respectively, dated December 2022 and December 2023. [25] As described below, the CRC Loans (including the Bridge Loan) were not used for their intended purpose, and the proceeds of the CRC Loans were subsequently diverted by Botero for his personal gain.

**2.    Botero Looted FinSocial by Diverting Its Assets to Himself and the Botero Network**

89.    In furtherance of Defendants' massive fraud scheme, and with FinSocial leveraged and flush with cash after the Bridge Loan (and other CRC Loans) Botero directed the wholesale diversion of that cash out of FinSocial to himself and the Botero Network (in addition to amounts paid to Kandeo and Medici under the SPA), without a business purpose, to hinder, delay, and defraud the Plaintiffs.

90.    Specifically, the Botero Network includes dozens of companies (believed to exceed 40) created, run, and controlled by Botero and/or various Botero-related individuals. Botero used this vast network of companies specializing in very different commercial areas and industries (*e.g.*, marketing, technology, leasing, real estate and art) for the primary purpose of establishing and benefitting from commercial relationships with FinSocial. Botero also used such entities to hold his real property and valuable artwork, among other assets. Botero then leveraged his control of such entities and used them as alter egos of himself and/or related entities he controlled to improperly siphon funds out of FinSocial and evade Plaintiffs– including the proceeds from the CRC Loans – looting the Company for his own benefit, while leaving FinSocial insolvent.

91.    Between January 1, 2021 and August 31, 2024, FinSocial, at the direction of Botero, disbursed tens of millions of U.S. dollars, including over $50 million directly to Botero, and the

---

[25] After entry into the Loan Agreements, CRC Funds entered into certain payment in kind agreements with FinSocial (as amended, the "PIK Agreements"), whereby certain alleged residual assets could be used to paydown interest on the CRC Loans. Notwithstanding the foregoing, the majority of the obligations due to the CRC Funds under the CRC Loans remained outstanding and unpaid. CRC is continuing to investigate issues relating to the CRC Loans, and reserves all rights with respect to the foregoing.

Botero Network, including at least $20 million to entities owned by, controlled by or associated with Botero's U.S.-related entities (collectively the "Fraudulent Transfers"). Myriad discrepancies in FinSocial accounting records, and/or a dearth of such records, lead to the conclusion that such disbursements were made with no sufficient business purpose, but rather, were improper disbursements designed to siphon funds out of FinSocial for the benefit of Botero and the Botero Network, while FinSocial was insolvent or rendered insolvent and unable to pay its bills.

92.    A summary of transfers to Botero and the Botero Network is provided as follows:

| Category | Sub-Category | Amount COP | Amount USD |
|---|---|---|---|
| Disbursements directly to Botero | - | 3,865,828,041 | 942,885 |
| Disbursements to family members | - | 1,371,019,172 | 334,395 |
| Disbursements to companies affiliated with Botero | Disbursements to companies directly affiliated with Botero | 145,360,940,266 | 35,453,889 |
| | Disbursements to companies indirectly affiliated with Botero | 18,256,471,851 | 4,452,798 |
| Disbursements to individuals indirectly affiliated with Botero | - | 1,009,881,919 | 246,312 |
| Disbursements to other relevant companies | Disbursements to companies associated with FinSocial employees | 13,352,058,804 | 3,256,600 |
| | Disbursements to companies with third parties associated with Botero's business activities | 4,577,657,675 | 1,116,502 |
| Disbursements to FinSocial Employees | - | 31,128,704,264 | 7,592,366 |
| Other disbursements of interest | - | 2,502,988,396 | 610,485 |
| Total | - | 221,425,550,388 | 54,006,232 |

93.    Several prominent Botero-related entities exemplify the intentionally complex and intertwined nature – *and vast reach* – of the Botero Network, including its numerous connections to the U.S. Botero used these "alter ego" entities, which he directly or indirectly owned or controlled, to create an intricate shell game through which he diverted assets from FinSocial with no legitimate business purpose (including through inconsistent and contradictory entries in FinSocial's books and records reflecting recipients of transfers that did not match actual checks and wire receipts and/or were supported through bogus explanations in FinSocial's books and

records), and held such assets out of reach of the Plaintiffs and other creditors through his complex structure, including numerous related U.S. entities, for his own personal benefit – and to effectuate his massive fraud.

94.     Further detail concerning these related-party transactions is set forth below.

a.     SBO Investments S.A.S.

95.     SBO Investments S.A.S. ("SBO Investments") was incorporated in 2022 by Botero which listed himself and his 12-year-old son as founders. The manager, Ornella Christine Pisciotti Prado ("Prado"), was involved in at least five other Botero companies as a legal representative, manager or board member.

96.     By 2023, the sole shareholder of SBO Investments was SB Financial Holding Corp. ("SB Financial"), a corporation formed in Florida in 2021, of which Botero is president. Such entity is entwined in the Botero Network where numerous close associates of Botero are, or have been, involved as officers, among other things, and money flows in and out to related entities and individuals. For example, SB Financial borrowed nearly $4 million from Medici in 2021. There is also evidence of a transfer of $1.65 million from Medici to SB Financial to an account at Morgan Stanley Bank in New York.

97.     SBO Finance, LLC is another related company formed in Florida in 2022 and managed by Botero.

98.     Meanwhile, SBO Lab S.A.S. ("SBO Lab") is a related company in Colombia and both SBO Lab and SBO Investments serve as umbrella companies for several of Botero's businesses. SBO Investments is the shareholder of several other Botero-related corporations including Mas Real Estate S.A.S., Mas Experiences S.A.S., Serendipity S&J S.A.S., Open Door Warranties S.A.S., Twister Films S.A.S. and Catapult Media S.A.S.

31

99.    SBO Investments received at least $1,343,823 (USD equivalent) and Open Door Warranties S.A.S. (of which it is the shareholder) received at least $5,385,200 (USD equivalent) from FinSocial during the period from January 1, 2021 through August 31, 2024 for no legitimate business purpose.

b.    Red 5G S.A.S.

100.    Red 5G S.A.S. ("Red 5G") was incorporated in 2012 with Botero as the owner. Close Botero associate Jean Pierre Grosso Lewis ("Grosso") is a shareholder and by 2022, SBO Lab and another Botero entity, Epikus S.A.S., were shareholders as well. In 2023, Grosso was the sole owner of the company.

101.    Meanwhile, Red 5G, LLC is a company formed in Florida in 2021. The articles of incorporation state that Botero was authorized to submit the formation documents as an authorized representative.

102.    Red 5G appears to be a prominent Botero entity, providing software development services in Colombia. After the acquisition of FinSocial, FinSocial outsourced some of its information technology to Red 5G and Botero promised that Red 5G would be combined with FinSocial (which was not consummated).

103.    Red 5G and its shareholders were identified as alleged suppliers of FinSocial and received at least $6,484,999 (USD equivalent) from FinSocial during the period from January 1, 2021 through August 31, 2024 for no legitimate business purpose.

c.    Home Capital Colombia S.A.S.

104.    Home Capital Colombia S.A.S. ("Home Capital") was formed in 2018 and Botero joined the board in 2021.

105.    Home Capital Outlet, LLC was incorporated in Delaware in 2023 and is the current shareholder of Home Capital.

106.    Home Kapital Finance, LLC ("Home Kapital") is a company formed in Florida in 2021 with a similar commercial purpose in providing home mortgage loans. Numerous Botero associates are or have been involved with Home Kapital including a former FinSocial employee, Jose Hernando Castro ("Castro"), and Jorge Rojas ("Rojas").

107.    Botero led the capital injection of $800,000 into Home Capital in 2021, bringing in several well-known investors including the former president of Bancolombia. Notably, Botero is being criminally investigated in 29 proceedings for his participation in Home Capital, among 19 other defendants, for allegedly having failed to comply with an operation of assignment of economic rights in investment projects.

108.    Home Capital received at least $468,293 (USD equivalent) from FinSocial during the period from January 1, 2021 through August 31, 2024 for no legitimate business purpose.

d.    Wiicar S.A.S.

109.    Wiicar S.A.S. ("Wiicar") was incorporated in 2021, with Botero as the sole shareholder and its commercial purpose being the creation of digital credit platforms to facilitate the purchase of vehicles. The company was later included under the corporate umbrella of SBO Lab, which, as described above, is one of Botero's main holding companies in Colombia.

110.    Wiicar U.S., LLC ("Wiicar U.S.") was formed in Florida in 2023 and Rojas is a manager. According to its website, Wiicar U.S. is a sales finance company similarly involved in the auto industry.

111.    Wiicar received at least $4,892,991 (USD equivalent) from FinSocial during the period from January 1, 2021 through August 31, 2024 for no legitimate business purpose.

e.    Medici

112.    Medici was incorporated in 2017. By 2021, shareholders included Botero, as well as his father, mother and stepmother. As detailed above, Medici owned FinSocial's stock, alongside Kandeo, before selling to CRC through the SPA.

113.    The company had an inexplicable capital increase in 2022 from $10,000 COP to $915,000 COP. Meanwhile, the balance sheet from 2021 shows that the company's assets reached an amount of over $44 billion COP.

114.    I Medici, LLC ("Medici U.S.") was formed in Miami, Florida in 2020. Botero is listed in the Articles of Incorporation as a manager and authorized entity representative. Medici is believed to be Botero's art collection vehicle in Colombia, which suggests this may also be the purpose of Medici U.S. in Miami. Medici U.S. is also believed to own real property in Florida.

115.    Medici – despite selling its equity in FinSocial through the SPA in 2021 – received at least $3,257,115 (USD equivalent) from FinSocial during the period from January 1, 2021 through August 31, 2024 for no legitimate business purpose.

f.    Botero Financial, LLC

116.    Botero Financial, LLC ("Botero Financial") is a limited liability company formed in Miami, Florida in 2021. Botero and Grosso are the entity's managers.

117.    As noted, Grosso is one of Botero's closest allies. He is present in at least six of Botero's Colombian companies, including Red 5G, Mas Art, SB Financial, Serendipity S&J S.A.S., Wiitools, Open Door Warranties S.A.S. and Coophumana – the main cooperative Botero may have used to defraud CRC.

g.    Courier Payments

118.    FinSocial's courier, Rafael Zarache, received a cash payment in excess of $2.6 million (USD equivalent) in March 2023, through a single cash disbursement, which was subsequently paid to Medici. Such transfers were made for no legitimate business purpose.

119.    FinSocial courier, Daniel Blanco received cash payments of over $4.8 million (USD equivalent) during the period from January 1, 2021, through August 31, 2024, for no legitimate business purpose.

**3.    International Wire Transfers**

120.    According to the information reported by Bancolombia, FinSocial made 226 international wire transfers to 25 third parties totaling nearly $49 million between January 1, 2021 and August 31, 2024.

121.    Meanwhile, Kandeo received disbursements totaling over $4 million.[26] Notably, only two disbursements were made in 2021 when the SPA was entered, while 12 disbursements were received by Kandeo in 2022 and 2023. In addition, the banking records reflect that Kandeo received a SWIFT transfer from Aviario (funded by CRC Funds) via BNY in the amount of $19 million in July 2021, related to the SPA.

122.    In addition, various deferred payments under the SPA were wired to Kandeo and Medici. With interest, such wire transfers exceeded $7 million, as detailed below.

Medici:

| # | Date | Beneficiary Name | Amount COP | Amount c.USD | Reference with attachment |
|---|------|------------------|-----------|--------------|---------------------------|
| 1 | 31/01/2022 | I MEDICI SAS | 246.131.507 | 60.032 | January 2022 |
| 2 | 29/04/2022 | I MEDICI SAS | 246.131.507 | 60.032 | April 2022 |

---

[26] Such appears to include payment of deferred amounts under the SPA.

| # | Date | Name | | | |
|---|---|---|---|---|---|
| 3 | 16/01/2023 | I MEDICI SAS | 725.024.000 | 176.835 | January 2023 |
| 4 | 16/01/2023 | I MEDICI SAS | 12.000.000 | 2.927 | January 2023 |
| 5 | 30/01/2023 | I MEDICI SAS | 1.144.863.155 | 279.235 | January 2023 |
| 6 | 28/02/2023 | I MEDICI SAS | 1.121.972.460 | 273.652 | February 2023 |
| 7 | 1/03/2023 | RAFAEL ZARACHE RAM[27] | 9.858.047.487 | 2.404.402 | March 2023 |
| | | | 13.354.170.116 | 3.257.115 | |

Kandeo:

| # | Date | Name | Amount COP | Amount c. USD | Reference with attachment |
|---|---|---|---|---|---|
| 1 | 9/07/2021 | Kandeo Spain Perú S.L. | 3.007.641.514 | 733.571 | July 2021 |
| 2 | 9/07/2021 | Kandeo Spain Latam S.L.U. | 1.716.186.490 | 418.582 | July 2021 |
| 3 | 1/02/2022 | Kandeo Spain Latam S.L.U. | 84.415.889 | 20.589 | February 2022 |
| 4 | 1/02/2022 | Kandeo Spain Perú S.L. | 140.543.049 | 34.279 | February 2022 |
| 5 | 2/05/2022 | Kandeo Spain Latam S.L.U. | 81.663.173 | 19.918 | May 2022 |
| 6 | 2/05/2022 | Kandeo Spain Perú S.L. | 135.960.106 | 33.161 | May 2022 |
| 7 | 29/07/2022 | Kandeo Spain Latam S.L.U. | 83.498.306 | 20.365 | July 2022 |
| 8 | 29/07/2022 | Kandeo Spain Perú S.L. | 139.015.412 | 33.906 | July 2022 |
| 9 | 31/10/2022 | Kandeo Spain Latam S.L.U. | 84.415.862 | 20.589 | October 2022 |
| 10 | 31/10/2022 | Kandeo Spain Perú S.L. | 140.543.054 | 34.279 | October 2022 |
| 11 | 15/12/2022 | Kandeo Spain Latam S.L.U. | 98.234.406 | 23960 | December 2022 |
| 12 | 15/12/2022 | Kandeo Spain Perú S.L. | 163.546.382 | 39.889 | December 2022 |
| 13 | 30/01/2023 | Kandeo Spain Latam S.L.U. | 3.951.447.792 | 963.768 | January 2023 |
| 14 | 30/01/2023 | Kandeo Spain Perú S.L. | 6.577.319.356 | 1.604.224 | January 2023 |
| | | | 16.404.430.791 | 4.001.080 | |

## F.    Defendants Fraud Extends to Certain Arbitration Provisions

123.    Defendants' fraudulent scheme extended beyond the SPA Misrepresentations, Financial and Collateral Misrepresentations, Loan Misrepresentations and False Certifications

---

[27] Payment made for benefit of Medici.

36

described herein that fraudulently induced Plaintiffs to enter into the SPA and Bridge Loan. Part and parcel with those fraudulent schemes was Defendants' insertion of provisions in certain of the parties' contracts purporting to hinder enforcement of Plaintiffs' rights. Specifically, Defendants drafted arbitration and choice-of-law provisions for inclusion in the SPA and Bridge Loan Agreement with the intent of depriving Plaintiffs of a judicial forum to enforce their rights, all while knowingly concealing the massive fraud alleged herein.

124. Defendants proposed the arbitration and choice of law provisions during negotiations related to the SPA and Bridge Loan Agreement, and, in doing so, implicitly represented them as standard, commercial terms for an investment deal, intended to provide a fair and efficient mechanism for resolving future disputes. Those representations were materially false. Defendants' actual purpose was to limit Plaintiffs from pursuing their rights under United States law, including the federal securities laws, in a United States court after Defendants had completed the fraudulent sale and loan transaction. If enforceable (absent some other bar), Defendants' combination of a Colombian choice of law provision with a Colombian arbitral forum would not allow for adjudication of U.S. federal law statutory claims for securities fraud, among others.

125. The choice of law and arbitral provisions in the SPA and Bridge Loan Agreement are unenforceable where they were fraudulently induced pursuant to Defendants' scheme, and, separately, because Plaintiffs cannot be held to have prospectively waived their federal statutory remedies.

**G.    Through Defendants' Various Frauds, They Perpetuated Their Schemes and Hindered and Delayed Their Discovery**

126. A further result of Defendants' myriad misrepresentations to Plaintiffs detailed herein was to conceal Defendants' fraudulent schemes from Plaintiffs. CRC did not discover, and could not reasonably have discovered, the full extent and true nature of the fraudulent schemes and

related malfeasance during the perpetration by Defendants. Throughout the relevant period, Botero, aided by a cadre of compromised advisers and loyal insiders, portrayed FinSocial's deteriorating condition as the product of ordinary business challenges and operational shortcomings, while actively concealing the existence of a massive fraud and taking affirmative steps to obscure his misconduct.

127.    Specifically, the fraud was concealed through false statements, falsified records, misleading reporting, and the deliberate obstruction described herein by individuals who remained in control of FinSocial's books, records, reporting functions, and operations.

128.    For example, between 2021 and 2023, FinSocial (under the control of Kandeo and Botero, and post 2022, Botero) overstated income in its financial statements by over $74 million, which, in the absence of such, would have resulted in accumulated losses of approximately $70 million during this period.

129.    In addition, during the period from 2022-2024. FinSocial (under the control of Botero) continued to engage in an egregious pattern of financial and accounting fraud. Specifically, during that period, Botero overstated assets and understated liabilities by a combined $95 million, including $52 million in overstated assets and $43 million in understated liabilities. The foregoing was ultimately uncovered, as discussed below, but only after the removals of Botero and Puerto in late 2024.

130.    Following Botero's removal, CRC deployed a team to assist FinSocial with cost reductions and operational improvements. CRC acted diligently and in good faith in seeking to understand and address FinSocial's mounting problems. Rather than cooperate, however, CRC encountered recalcitrance, delay, obstruction, and concealment by Botero and his cronies. At the time, the issues appeared to concern deficient and unreliable data, poor data collection practices,

escalating costs, and underperformance, rather than what is now understood to be missing assets, fabricated collateral, falsified financial information, and fraud. The information provided to CRC was incomplete, inaccurate, and intentionally misleading, preventing CRC from discovering the underlying misconduct despite the exercise of reasonable diligence.

131.    Only after CRC assumed control of FinSocial following Botero's departure did it begin to uncover the severity of the Company's financial problems, including deteriorating credit quality within the serviced portfolios, an unsustainable cost structure, and deeply inefficient operations. Even then, however, the only available evidence suggested mismanagement and poor controls rather than fraud. It was not until in or about October 2024 that more serious irregularities first came to light. CRC promptly engaged independent professionals, including forensic accountants, and by November 2024, installed disinterested management to take control of FinSocial.

132.    Moreover, even after his formal resignation, Botero continued to exert influence over loyal insiders and advisers, further obstructing efforts to obtain accurate information and obscuring the true state of FinSocial's business. FinSocial's books and records had been manipulated, key information was withheld or misrepresented, and the scope of the wrongdoing could not be discerned from ordinary diligence alone.

133.    Indeed, by December 20, 2024, Botero's key ally and former CFO, Puerto, was forced to resign, having confessed to the massive fraud.

134.    As a result of the foregoing, Plaintiffs are still uncovering the full magnitude of Defendants' intentional and complex fraudulent schemes.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**AGAINST DEFENDANTS KANDEO, BOTERO AND MEDICI FOR SECURITIES
FRAUD RELATED TO THE SPA**

135.    Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein.

136.    Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), includes a private right of action for securities fraud.

137.    The elements of a cause of action under section 10(b) of the Exchange Act are: (i) defendant made an untrue statement of material fact or omitted to state a material fact; (ii) defendant acted with scienter, *i.e.*, a wrongful state of mind; (iii) a connection with the purchase or sale of a security exists; (iv) plaintiff justifiably relied on defendants' misstatement or omission; and (v) plaintiffs suffered an economic loss as a result of such misstatement or omission.

138.    Defendants sold and Plaintiffs purchased FinSocial securities, within the meaning of the Exchange Act. 15 U.S.C. § 78c(a)(10).

139.    Defendants made numerous material misrepresentations of fact and/or omitted to state material facts, including the SPA Misrepresentations and the Financial and Collateral Misrepresentations, in connection with the purchase and/or sale of those securities.

140.    Defendants knowingly made false statements or omissions, including the SPA Misrepresentations and Financial and Collateral Misrepresentations, with the intent to and for the purpose of defrauding Plaintiffs, including by hiding the economic reality of FinSocial's sham business.

141.    Plaintiffs justifiably relied on Defendants' material misrepresentation and omissions, including the SPA Misrepresentations and the Financial and Collateral Misrepresentations, in entering into the SPA and purchasing the FinSocial securities.

142.    Plaintiffs have suffered substantial economic loss as a result of Defendants' misconduct.

143.    As a result of Defendants' misconduct, Plaintiffs have been damaged in an amount to be calculated for trial, but which is in no event less than $36 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

## SECOND CAUSE OF ACTION
## AGAINST DEFENDANT BOTERO FOR CONTROL LIABILITY REGARDING THE SPA

144.     Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein.

145.    Section 20(a) of the Exchange Act provides that a person who controls another person or entity that is liable for a violation of the Exchange Act is himself jointly and severally liable for that same primary violation.

146.    The elements of a cause of action under Section 20(a) of the Exchange Act are: (i) a primary violation by the controlled person; (ii) control of the primary violator by the defendant; and (iii) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's frauds.

147.    As detailed herein, Kandeo and Medici, amongst others, are liable for the primary violation of securities fraud under Section 10(b) of the Exchange Act.

148.    In addition, at all relevant times, Kandeo Advisors US acted as the controlling person of Kandeo Spain and Kandeo LATAM, and had, and exercised, the power and authority to cause Kandeo Spain and Kandeo LATAM to engage in the wrongful conduct complained of herein. Kandeo Advisors US exercised control of Kandeo Spain and Kandeo LATAM through its position as agent among other things. Kandeo Advisors US further leveraged its control of other persons and entities, including related parties, as alleged herein, to exercise authority and control over Kandeo Spain and Kandeo LATAM.

41

149.    At all relevant times, Botero acted as the controlling person of Medici, and had, and exercised, the power and authority to cause Medici to engage in the wrongful conduct complained of herein. Botero exercised his control of Medici through his position as CEO and controlling shareholder, among other things. Botero further leveraged his control of other persons and entities, including related parties, as alleged herein, to exercise authority and control over Medici.

150.    Kandeo Advisors US and Botero are culpable by participating in the fraud of Kandeo and Medici, respectively, alleged herein by, *inter alia*, knowingly making the SPA Misrepresentations and the Financial and Collateral Misrepresentations. Those misrepresentations were made by Kandeo and Medici– under the complete control of Kandeo Advisors US and Botero as the case may be – for the purpose of fraudulently inducing Plaintiffs to enter into the SPA and invest tens of millions of dollars in FinSocial's sham business for Botero's own benefit.

151.    Kandeo Advisors US and Botero are jointly and severally liable for the entire amount of Plaintiffs' damages in an amount to be calculated for trial, but which is in no event less than $36 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

### THIRD CAUSE OF ACTION
### AGAINST DEFENDANTS KANDEO, BOTERO AND MEDICI FOR FRAUDULENT INDUCEMENT RELATED TO THE SPA

152.    Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein.

153.    The elements of a cause of action for fraudulent inducement under New York law are: (i) defendant made a material false representation or omission; (ii) defendant intended to defraud the plaintiff thereby; (iii) plaintiff reasonably relied on defendant's false representation; and (iv) plaintiff suffered damage as a result of such reliance.

154.    As detailed herein, Defendants made material misrepresentations of fact and/or omitted to state material facts, including the SPA Misrepresentations and the Financial and

Collateral Misrepresentations, in connection with Defendants' sale and Plaintiffs' purchase of FinSocial securities.

155. Defendants knowingly made material misrepresentations of fact and/or omitted to state material facts, including the SPA Misrepresentations and the Financial and Collateral Misrepresentations, with the intent to and for the purpose of defrauding Plaintiffs, including by hiding the economic reality of FinSocial's sham business and inducing CRC to enter into the SPA and spend tens of millions of dollars for their own benefit.

156. Plaintiffs justifiably relied on the Defendants' material misrepresentations and omissions, including the SPA Misrepresentations and the Financial and Collateral Misrepresentations, in entering the SPA and purchasing the FinSocial securities.

157. In reliance upon Defendants' material misrepresentations and omissions, including the SPA Misrepresentations and the Financial and Collateral Misrepresentations, Plaintiffs suffered substantial economic loss. But for Defendants' material misrepresentations and omissions, including the SPA Misrepresentations and the Financial and Collateral Misrepresentations, Plaintiffs would never have entered into the SPA or otherwise purchased the FinSocial shares.

158. In addition, to the extent the Court concludes that so-called arbitration and choice-of-law provisions govern any of Plaintiffs' claims, those provisions were themselves procured by fraud and, if enforced, would effect an impermissible prospective waiver of Plaintiffs' federal statutory rights. They are therefore unenforceable.

159. As a result, Plaintiffs have been damaged in an amount to be calculated for trial, but which is in no event less than $36 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

**FOURTH CAUSE OF ACTION**
**AGAINST DEFENDANTS KANDEO, BOTERO AND MEDICI FOR FRAUDULENT INDUCEMENT RELATED TO THE BRIDGE LOAN**

160.    Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein.

161.    The elements of a cause of action for fraudulent inducement under New York law are: (i) defendant made a material false representation or omission; (ii) defendant intended to defraud the plaintiff thereby; (iii) plaintiff reasonably relied on defendant's false representation; and (iv) plaintiff suffered damage as a result of such reliance.

162.    As detailed herein, Defendants made material misrepresentations of fact and/or omitted to state material facts, including the Financial and Collateral Misrepresentations, Loan Misrepresentations, and False certifications in connection with the Bridge Loan.

163.    Defendants made material misrepresentations of fact and/or omitted to state material facts, including the Financial and Collateral Misrepresentations, Loan Misrepresentations, and False Certifications, knowingly and with the intent and purpose of defrauding Plaintiffs, including by inducing Plaintiffs to enter into the Bridge Loan based on such misrepresentations including, amongst other things, misstatements with respect to fake collateral, inflated assets, underreported liabilities, and undisclosed insider transfers.

164.    Plaintiffs justifiably relied on Defendants' material misrepresentations and omissions, including the Financial and Collateral Misrepresentations, Loan Misrepresentations, and False Certifications, in connection with the Bridge Loan.

165.    In reliance upon Defendants' material misrepresentations and omissions, including the Financial and Collateral Misrepresentations, Loan Misrepresentations, and False Certifications, Plaintiffs suffered substantial economic loss. But for Defendants' material misrepresentations or omissions, as provided above, Plaintiffs would never have agreed to make the Bridge Loan to FinSocial.

166.    In addition, to the extent the Court concludes so-called arbitration and choice-of-law provisions govern any of Plaintiffs' claims, those provisions were themselves procured by fraud and, if enforced, would effect an impermissible prospective waiver of Plaintiffs' federal statutory rights. They are therefore unenforceable.

167.    As a result, Plaintiffs have been damaged in an amount to be calculated for trial, but which is in no event less than $19 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

**FIFTH CAUSE OF ACTION**
**AGAINST DEFENDANTS BOTERO, MEDICI, AND KANDEO FOR CONSPIRACY TO DEFRAUD IN CONNECTION WITH BRIDGE LOAN**

168.    Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein.

169.    The elements of a claim of conspiracy to defraud under New York law are: (1) the existence of a fraud; (2) agreement among the conspirators; (3) an overt act in furtherance of the agreement; (4) intentional participation by the conspirators in furtherance of a plan or purpose; and (5) damages.

170.    As detailed above, Defendants fraudulently induced Plaintiffs to enter into the Bridge Loan through the Financial and Collateral Misrepresentations, Loan Misrepresentations, and False Certifications.

171.    Defendants agreed and acted together, along with the non-party Botero Entities, to perpetrate that fraud against Plaintiffs.

172.    Specifically, Defendants acting in concert with the Botero Entities, conspired, through a series of deceptive and fraudulent actions, to fraudulently induce the Plaintiffs to make the Bridge Loan to FinSocial, and then divert the proceeds of the Bridge Loan from FinSocial to themselves and the Botero Entities for their own personal gain.

45

173. Defendants' conspiracy enabled Defendants to effectuate their scheme of first inducing the Plaintiffs to make the Bridge Loan to FinSocial, and then as to Botero and the Botero Entities, diverting the proceeds of such loan out of FinSocial and into their own pockets, all to the severe detriment of the Plaintiffs.

174. These Defendants acted with the intentional and common purpose of enabling and perpetrating the fraudulent scheme as provided above, which constituted the Plaintiffs' collateral, thereby rendering the Bridge Loan uncollectable.

175. Accordingly, Plaintiffs are entitled to judgment against each of the Defendants jointly and severally in an amount of at least $19 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

**SIXTH CAUSE OF ACTION**
**AGAINST DEFENDANT BOTERO FOR AIDING AND ABETTING FRAUD IN CONNECTION WITH STRIPPING FINSOCIAL ASSETS**

176. Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein.

177. The elements of a claim of aiding and abetting fraud under New York law are: (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.

178. As alleged above, Botero, through the Botero Entities he was associated with and controlled, defrauded the Plaintiffs by looting and diverting funds out of FinSocial to himself and the Botero Entities to the detriment FinSocial and its creditors, including Plaintiffs.

179. Botero knowingly and substantially assisted in the fraudulent scheme by, among other things, inducing CRC to advance millions of dollars in loans to FinSocial supported by fake and non-existent loans and siphoning the proceeds of such loans out of FinSocial through payments to himself and the Botero Entities for no valid business purpose, but solely for their own benefit, as detailed more fully above and herein.

46

180. The Plaintiffs suffered damage as a direct result of Botero's substantial assistance to perpetrate the fraudulent diversion of assets out of FinSocial and out of the reach of the Plaintiffs, thereby proximately contributing to the Plaintiffs' loss of their investment in FinSocial.

181. Accordingly, the Plaintiffs are entitled to judgment against Botero in an amount of at least $50 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

**SEVENTH CAUSE OF ACTION**
**AGAINST DEFENDANT BOTERO AS ALTER EGO**

182. Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein. Under New York law, in order to hold owners liable for the acts of their corporation: (a) the owners must exercise complete control, not only of finances but of policy and business practices so that the corporate entity as to the transaction had no separate mind, will or existence of its own; (b) such control must have been used to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and (c) the aforesaid control and breach of duty must proximately cause injury or unjust loss complained of.

183. Defendant Botero exercised such complete control over Medici and the Botero Entities that those corporate entities had no separate mind or identity of their own.

184. Defendant Botero used his control over Medici and the Botero Entities in order to fraudulently induce Plaintiffs to enter into the SPA, among other things, and then fraudulently divert related proceeds and other assets out of FinSocial in violation of Plaintiffs' legal rights.

185. Botero's control over Medici and the Botero Entities and their fraudulent conduct proximately caused substantial damages to Plaintiffs.

47

186.    Accordingly, Defendant Botero is liable to pay the amounts due hereunder in the amount of not less than $50 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

**EIGHTH CAUSE OF ACTION**
**AGAINST DEFENDANTS KANDEO, MEDICI, AND BOTERO FOR UNJUST ENRICHMENT**

187.    Plaintiffs repeat and reallege all paragraphs above, as specifically set forth herein.

188.    The elements of a claim of unjust enrichment under New York law are: (1) defendants received a benefit and/or other advantage; (2) such benefit(s) was at the expense of plaintiff; and (3) equity and good conscience do not permit defendant to retain such benefit.

189.    Through their fraudulent and improper schemes, Defendants directly and/or indirectly received valuable assets, including, but not limited to, the ill-gotten proceeds from the fraudulent sale of FinSocial's stock under the SPA, and through the looting of FinSocial and diversion of assets to Botero and the Botero Entities. The foregoing included cash paid from the sale of the business supported by cooked books and fraudulent practices, and the diversion of assets converted from FinSocial without a valid business purpose and without providing compensation to FinSocial.

190.    Defendants received a windfall as a result of such fraudulent and improper schemes at the expense of Plaintiffs. In addition, Botero (and the Botero Entities) have provided no fair consideration, or indeed any consideration to FinSocial, nor to its respective creditors with respect to assets transferred out of FinSocial.

191.    Such course of conduct includes, but is not limited to, fraudulent stock sale, the scheme to fraudulently induce the Bridge Loan to loan funds to FinSocial, and the improper and fraudulent transfer and stripping of FinSocial assets, which constitute CRC Funds' collateral, to Botero and the Botero Entities to enrich such parties, to the detriment of CRC Funds.

192.    It would be highly inequitable and unjust for Defendants to retain the benefits they fraudulent received from the stock sale or the assets transferred and/or the fruits of such assets received from the loan transactions at the expense of FinSocial's creditors, including the Plaintiffs.

193.    Accordingly, the Plaintiffs are entitled to judgment against each of the Defendants Kandeo and Medici in an amount of at least $50 million, jointly and severally, and Botero in an amount of at least $100 million, plus interest at the statutory rate and attorneys' fees and costs as permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants on the afore referenced causes of action as follows:

a.    Award Plaintiffs compensatory and punitive damages, including pre-judgment interest, against all Defendants in an amount to be determined at trial but believed to exceed $150 million.

b.    Impose a constructive trust in favor of Plaintiffs.

c.    Awarding Plaintiffs all relief to which they are entitled pursuant to law and equity, including, but not limited to, an order granting judgment against Defendants, and prejudgment interest at the statutory rate;

d.    Award the costs of this action to Plaintiffs, including reasonable attorneys' fees as permitted by law; and

e.    Order such other and further relief as the Court deems just and proper.

Dated: July 8, 2026

Respectfully submitted,

JENNER & BLOCK LLP

By: */s/ Douglas E. Spelfogel*
Douglas E. Spelfogel
Steven Ascher
Michael Ross
Derek Wright
Carl N. Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
dspelfogel@jenner.com
sascher@jenner.com
mross@jenner.com
dwright@jenner.com
cwedoff@jenner.com

*Attorneys for Christofferson Robb & Company
and General Investments (Cayman) Limited*

**Exhibit Index**

| Exhibit | Document Description |
|---|---|
| **A** | Share Purchase Agreement, March 2, 2021, (English) |
| **B** | FinSocial Audited Financial Report, 2019 (English and Spanish) |
| **C** | FinSocial Audited Financial Report, 2020 (English and Spanish) |
| **D** | FinSocial Audited Financial Report, 2021 (English and Spanish) |
| **E** | Bancolodex Audit Report, February 20, 2025 (English and Spanish) |
| **F – 1.1** | Bridge Loan Agreement, May 21, 2021 (English) |
| **F – 1.2** | Bridge Loan Agreement, May 21, 2021 (Spanish) |
| **F - 2** | Promissory Notes, May 20, 2021 (English and Spanish) |
| **G -1** | Annex VII – Pre-acquisition Disbursement Debtor Certifications (English and Spanish) |
| **G - 2** | Certificate of Administrative and Guarantor Agent, May 21, 2021 (English and Spanish) |
| **G – 3** | Pre-acquisition Disbursement Request, May 21, 2021 (English and Spanish) |